IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

*Plaintiff,*

vs.

Case No. 12-10119-01-EFM

RAYMOND J. HICKMAN, JR.,

*Defendant.*

**MEMORANDUM AND ORDER**

Defendant Raymond J. Hickman, Jr. filed two motions to suppress. The first motion asks the Court to suppress evidence of crack cocaine and a firearm found in a vehicle not specifically described in a search warrant. The second motion seeks suppression of inculpatory statements made by Hickman and a third-party witness, which Hickman claims were involuntary and coerced. The Court denies Hickman's first motion because the police properly recovered the evidence from a vehicle parked on the premises mentioned in a valid search warrant. The Court also denies the motion to suppress statements of Hickman and a third-party witness because credible testimony does not support Hickman's claim that coercive or threatening behavior rendered the statements involuntary.

## I. Factual and Procedural Background

After receiving an anonymous call advising that Hickman was involved in drug activity at a particular residence, Detective Shawn McClay of the Reno County Drug Enforcement Unit initiated surveillance of the premises at 546 E. 3rd, Hutchinson, Reno County, Kansas. At that time, the premises served as the primary residence of Hickman's former girlfriend, Ashely Harmon, and her three minor children.[1] Hickman did not live on the premises, but he was a frequent visitor and often stayed in the home with Harmon and her children. The anonymous tip included information concerning two vehicles that commonly appeared at the residence. Det. McClay identified the first vehicle as a Chevrolet Monte Carlo (hereafter "Monte Carlo"), but he could not identify the make and model of the second vehicle. On June 21, 2011, the District Court for Reno County, Kansas, issued two separate search warrants. The first warrant authorized the search of the Monte Carlo, and the second warrant generally authorized a search of "the premises of 546 E. 3rd, Hutchinson, Reno County, Kansas, and any outbuildings associated with the property."[2]

On June 22, 2011, the Reno County Drug Enforcement Unit executed both search warrants. Officers arrested Hickman in the backyard of the residence and then took him inside the home to wait until the search was completed. The police did not obtain any evidence from the Monte Carlo, but officers located crack cocaine and drug paraphernalia in the residence. While conducting their search of the premises, officers observed the second vehicle referenced by the anonymous caller, a 1992 Mercury Grand Marquis (hereafter "Grand Marquis"). Harmon

---

[1] The Court notes that Hickman had dated Harmon for approximately five months at the time of his arrest, and that Hickman is not the father of Ashely Harmon's children.

[2] Search Warrant, Doc. 13, Gov't Ex. 1, at p. 2.

owned the Grand Marquis,[3] but Hickman had permission to use it and possessed a second set of keys. At all times relevant to the search, the Grand Marquis was parked on the premises described in the residential search warrant. Officers searched the Grand Marquis and recovered a firearm and additional evidence of crack cocaine.

When the officers completed the search, Det. McClay advised Hickman of his *Miranda* rights and confirmed that Hickman agreed to speak with the police. Hickman had been arrested several times and he was familiar with his *Miranda* rights at the time of his arrest and questioning. Hickman then admitted to owning the crack cocaine found in the residence, but denied having any knowledge of the crack cocaine or firearm located in the Grand Marquis. Hickman also told the police that Harmon had no knowledge of any drugs, firearms, or other paraphernalia on the premises. The parties agree that Det. McClay informed Hickman that he was the sole target of the investigation and that Harmon was not in danger of imprisonment.[4] Nonetheless, Hickman alleges that Det. McClay said, "if you don't own up to the drugs and you play a game with us, we're gonna take [Harmon] and the kids." Hickman understood this alleged statement as a threat that Harmon would lose custody of her children if he did not confess. Det. McClay denies making any statement to Hickman regarding Harmon or the custody of her children.

Det. McClay also questioned Ashely Harmon about potential drug activity on the premises. Harmon told the police that Hickman kept an overnight bag in the residence, but she did not provide any inculpatory information against Hickman and denied having any knowledge of drugs, firearms, or other paraphernalia on the premises. During that conversation, Det.

---

[3] Harmon registered the Grand Marquis exclusively in her name after purchasing the vehicle with Hickman's money.

[4] In the suppression hearing, Hickman testified, "[T]hey made it clear that I was the one going to jail, that she was never in any danger of it because they were going to make sure that I was the target at that time."

McClay advised Harmon that drug activity could create significant dangers for young children living in the household. Det. McClay then assured Harmon that she was not a target of the investigation. Det. McClay denies that he mentioned the custody of Harmon's children in any way, and he denies that he threatened to deprive Harmon of custody if she refused to offer evidence against Hickman. Harmon claims that another officer, Curtis Black, explained that if she were charged with a crime, she could serve time in jail away from her children. The parties agree that Officer Black did not tell Harmon that the custody of her children depended in any way upon providing evidence against Hickman. Hickman alleges that the conduct of Det. McClay and Officer Black render Harmon's statements involuntary.

Hickman also claims that the government continued to threaten and harass Harmon following the search. During the grand jury proceedings, Harmon volunteered that she had been fighting for the custody of two of her children while discussing her concern about a box of ammunition that Hickman kept in her home. The Assistant U.S. Attorney later sought to clarify Harmon's volunteered statement by asking Harmon whether she did in fact obtain custody of her children. Harmon testified that she did not feel that the government threatened the custody of her children during the grand jury proceeding, and that she never felt that the custody of her children was conditioned upon providing information, evidence, or testimony against Hickman.

## II. Analysis

### A.   Motion to Suppress Evidence

Defendant Hickman first asks the Court to suppress evidence that the police recovered from the Grand Marquis, arguing that the vehicle fell beyond the scope of the residential search warrant. The Court must make a preliminary determination regarding whether Hickman had a

reasonable expectation of privacy in the vehicle sufficient to challenge the search.[5] A "person has standing only to challenge the violation of his own Fourth Amendment rights."[6] "Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises."[7] To establish standing, "[a] defendant is not required to produce legal documentation showing a chain of lawful custody from the registered owner to himself."[8] Rather, when a defendant offers "sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle."[9] Here, both Hickman and Harmon testified that Hickman had permission to drive the Grand Marquis. Accordingly, the Court finds that Hickman had a reasonable expectation of privacy in the Grand Marquis, and therefore, has standing to challenge the search.

Hickman argues that the Court must exclude evidence recovered from the Grand Marquis because the residential search warrant did not contemplate a search of that vehicle. A defendant bears the burden of proving that a search or seizure exceeded the scope of a valid search warrant.[10] It is well-established that "[a] search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search

---

[5] *United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990).

[6] *United States v. Ladeaux*, 454 F.3d 1107, 1112 (10th Cir. 2006).

[7] *United States v. DeLuca*, 269 F.3d 1128, 1131 (10th Cir. 2001).

[8] *Id.* (quoting *United States v. Arango*, 912 F.2d 441, 446 (10th Cir. 1990)).

[9] *Id.*

[10] *United States v. Higgins*, 282 F.3d 1261, 1269 (10th Cir. 2002); *United States v. Kaufman*, 2005 WL 2304345, at *6 (D. Kan. Sept. 21, 2005).

might be located therein."[11]  The Tenth Circuit "define[s] the scope of the warrant to include those automobiles either [1] actually owned or under the control and dominion of the premises owner or, alternatively, [2] those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled."[12]

Both parties acknowledge that *United States v. Gottschalk*[13] governs whether the Grand Marquis fell within the scope of the residential search warrant.  In *Gottschalk*, police obtained evidence of narcotics in the defendant's inoperable vehicle, which was parked on the premises. The underlying warrant authorized the search of certain premises but did not specifically mention any vehicles.[14]  Although the vehicle was parked on the premises described in the warrant, the owner of the residence lacked actual ownership or control over the vehicle.[15]  The defendant moved to suppress the evidence, arguing that the search exceeded the scope of the warrant.[16]  The Tenth Circuit upheld the search, ruling that the residential warrant broadly authorized the search of vehicles on the premises.[17]

In this case, the Grand Marquis was actually owned by and under the control of the premises owner, Ashely Harmon.  Harmon had keys to the Grand Marquis, and the vehicle was registered exclusively in her name.  Further, the vehicle's continued presence on the premises gave rise to an objectively reasonable appearance that Harmon owned or controlled the vehicle.

---

[11] *Id.*

[12] *Id.*

[13] 915 F.2d 1459 (10th Cir. 1990).

[14] *Id.* at 1460.

[15] *Id.*

[16] *Id.*

[17] *Id.* at 1461.

The Court finds that the residential warrant in this case generally authorized the search of the Grand Marquis because it was parked on the premises.

Hickman also argues that the existence of a search warrant for the Monte Carlo meant that the residential search warrant implicitly excluded the Grand Marquis. If the government contemplated a search of the Grand Marquis, Hickman argues, it would have obtained a separate warrant similar to the one specifically issued for the Monte Carlo. The Court finds no authority that lends support to Hickman's argument. To the contrary, *Gottschalk* clarified that a warrant authorizing the search of certain premises generally includes any vehicles located on the property even when the search warrant does not specifically list any vehicles to be searched.[18] The search warrant issued for the Monte Carlo in this case is irrelevant to the scope of the independent warrant authorizing the search of Harmon's residence. Because the Grand Marquis fell within the scope of the residential search warrant, Hickman's motion to suppress evidence is denied.

**B.     Motion to Suppress Statements**

Hickman also seeks the suppression of statements made following the search. Specifically, Hickman claims that he and Harmon each made involuntary and inculpatory statements as a result of threats that Harmon would lose custody of her children. "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt."[19] When determining voluntariness, the Court considers the totality of the circumstances, including "the intelligence and education of the individual being questioned, whether he was advised of his constitutional rights, the length of

---

[18] *See id.* at 1460 (upholding a search of vehicles when "the search warrant did not specifically list any vehicles to be searched, but rather authorized the search of the entire premises").

[19] *United States v. Short*, 947 F.2d 1445, 1449 (10th Cir. 1991).

detention, the prolonged nature of the questioning, and whether the individual was physically punished."[20]  "The central consideration in determining whether a confession has been coerced always involves this question: did the governmental conduct complained of bring about a confession not freely self-determined?"[21]  Because different burdens apply to suppression of statements from Hickman and Harmon, the Court will address each individually.

### 1.   Statements of Defendant Hickman

The government bears the burden of proving that Hickman's statements were voluntary.[22]  Immediately following his arrest, Hickman admitted to the police that he used crack cocaine and that he owned the crack cocaine that the police found in Harmon's home.  Hickman claims that these statements were the involuntary product of government coercion.  According to Hickman, Det. McClay said, "[I]f you don't own up to the drugs and you play a game with us, we're gonna take [Harmon] and the kids."  Hickman understood this alleged statement as a threat that if he refused to confess, the police would arrest Harmon, thereby depriving her of custody of her children.  Det. McClay denies making any statement to Hickman regarding Harmon or her children, and Det. McClay specifically denies telling Hickman that Harmon could lose custody of her children if he did not cooperate.  Given these contradictory accounts, the Court must consider the credibility of testimony given by Hickman and Det. McClay.

The Court does not find Hickman's testimony credible.  Hickman acknowledges that, before his admission, officers explained that he was the sole target of the investigation and that Harmon was not in danger of imprisonment.  The Court also finds it unreasonable that Hickman could genuinely fear Harmon's imprisonment after telling the officers that Harmon had no

---

[20] *Id.* at 1449 (citing *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991)).

[21] *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir. 1993).

[22] *United States v. Muniz*, 1 F.3d 1018, 1021 (10th Cir. 1993).

knowledge of drug activity on the premises.  The Court finds more credible Det. McClay's testimony that neither he nor any other officer coerced Hickman by issuing threats regarding the custody of Harmon's children.  Accordingly, because the Court finds the testimony of Det. McClay more credible than that of Hickman, the Court concludes that Det. McClay did not threaten the custody of Harmon's children during the search.

Having found that Hickman's admissions did not result from a specific threat, the Court finds no other evidence of coercion that could support suppression of Hickman's statements.  As a published author and student of literature, Hickman is a man of reasonable education and intelligence.  Hickman also testified that because he has been arrested numerous times, he was very familiar with his *Miranda* rights at the time of his interrogation.  Hickman does not allege that he was unreasonably detained, that his questioning was unreasonably prolonged, or that he suffered physical punishment.  Upon considering the totality of circumstances, the Court finds that Hickman's will was not overborne by any coercion or threat concerning the custody of Harmon's children.  Accordingly, the motion to suppress Hickman's statements is denied.

### 2. Statements of Ashely Harmon

Hickman finally asks the Court to suppress the statements and testimony of Ashely Harmon, arguing that coercion and threats rendered her prior statements involuntary, and that continued threats may render her prospective testimony unreliable. A defendant generally has standing to challenge the voluntariness of a witness' statement in order to protect his own right to due process.[23]  In this case, Hickman does not seek to assert rights on behalf of Harmon, but

---

[23] *United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005); *Clanton v. Cooper*, 129 F.3d 1147, 1157–58 (10th Cir. 1997); *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) (holding that a defendant generally has standing to challenge the voluntariness of coerced statements made by a third-party witness).

rather, to protect his own right to a fair trial. Therefore, the Court finds that Hickman has standing to challenge the voluntariness of Harmon's statements.

"[W]hen a defendant makes a motion to exclude coerced testimony of a third party on due process grounds, the burden of proving improper coercion is upon the defendant."[24] "The standard for determining whether a statement was voluntary is the same whether we are dealing with a defendant or a third party."[25] Hickman first seeks suppression of statements that Harmon made during the search. Harmon told the police that Hickman kept an overnight bag on the premises, but she did not provide any inculpatory evidence against Hickman and denied having any knowledge of drugs, firearms, or other paraphernalia. The testimony of Det. McClay reflects that he told Harmon that it was dangerous for children to live in a home with drug activity. Harmon testified that Officer Black then explained that if she lied to the police and was convicted of a crime, she may be sentenced to serve time in jail away from her children. Hickman claims that the words and conduct of Det. McClay and Officer Black threatened the custody of Harmon's children, rendering her subsequent statements involuntary. The Court disagrees.

Hickman has failed to produce any evidence that Det. McClay overcame Harmon's will by threatening the custody of Harmon's children. The only statement attributable to Det. McClay referred exclusively to the children's general safety. No evidence suggests that Det. McClay's statement contemplated Harmon's incarceration or the custody of her children. In fact, the testimony of Det. McClay indicates that he informed Harmon that Hickman was the sole target of the investigation. Because Hickman has failed to demonstrate that Det. McClay made

---

[24] *Dowell*, 430 F.3d at 1107 (quoting *People v. Badgett*, 895 P.2d 877, 886–87 (Cal. 1995)).

[25] *Id.* (quoting *Gonzalez*, 164 F.3d at 1289).

any coercive or threatening statement, the Court finds that Harmon's statements were not rendered involuntary by the conduct of Det. McClay.

Hickman also alleges that the conduct of Officer Black rendered Harmon's statements involuntary. At the suppression hearing, Harmon testified that Officer Black truthfully and courteously explained that if she lied to the police and was convicted of a crime, she could be sentenced to serve time in jail and would not have custody of her children during her imprisonment. Indeed, a witness's statement may be rendered involuntary when an officer preys upon her maternal instincts by expressly stating that the witness will lose custody of her children if she fails to cooperate.[26] However, courts distinguish such threats from statements providing accurate information regarding the consequences of illegal conduct. A witness's statement is not rendered involuntary simply because an officer advises the witness that she may lose custody of her children if sentenced to imprisonment.[27] Such statements simply inform the witness of possible consequences of illegal acts.[28]

Here, Harmon has specifically testified that Officer Blackman never told her that she would lose custody of her children if she failed to provide information against Hickman. Rather, Harmon's testimony demonstrates that Officer Black merely explained the search warrant and informed her of potential consequences if she provided false information and was charged with a crime. Because Officer Black merely informed Harmon of potential consequences and did not threaten the custody of Harmon's children if she refused to cooperate, the Court finds that the

---

[26] *United States v. Perez-Guerrero*, 2012 WL 683201, at *12 (D. Kan. Mar. 2, 2012).

[27] *United States v. Alcarez-Mora*, 246 F. Supp. 2d 1146, 1153–54 (D. Kan. 2003) ("Informing the defendant that he and his wife could go to jail and that other arrangements would have to be made for the care of their children if the defendant does not cooperate does not render his confession involuntary when these events are merely consequences of defendant's illegal acts."). While the court in *Alcarez-Mora* ultimately granted a motion to suppress the defendant's statement, it did so only because the officers made a specific threat that the defendants would never see their children again. *Id.* at 1154-55.

[28] *Id.*

statements of Officer Black were not coercive or threatening. In the absence of any other traditional indicia of coercion, the Court concludes that Harmon's statements following the search were voluntary.

Hickman also challenges the voluntariness of Harmon's statements during the grand jury proceedings, arguing that Harmon's grand jury testimony was coerced through the government's veiled threats concerning the custody of Harmon's children. The record does not support Hickman's allegation. Harmon's children were only mentioned twice during the grand jury proceedings. Harmon first volunteered that she had been fighting for the custody of two of her children as she discussed her concern about a box of ammunition that Hickman kept in her home. The second reference to Harmon's children came when the Assistant U.S. Attorney later sought to clarify Harmon's volunteered statement by asking whether Harmon did in fact obtain custody of her children. Harmon's testimony confirms that she did not feel that the government threatened the custody of her children during the grand jury proceeding, and that she never felt that the custody of her children was conditioned upon providing evidence or testimony against Hickman. Considering the totality of circumstances, the Court finds that Harmon voluntarily offered her testimony before the grand jury. Because Hickman has failed to prove that Harmon gave involuntary and coerced statements during the search and in the subsequent grand jury proceedings, the Court denies Hickman's motion to suppress Harmon's prior statements.

Finally, Hickman seeks a pretrial order excluding prospective testimony from Harmon at trial. Hickman claims that alleged threats from Det. McClay, Officer Black, and the Assistant U.S. Attorney regarding the custody of her children constitute continuing coercion that would render Harmon's prospective testimony involuntary and unreliable. For the reasons articulated above, the Court is not persuaded that Harmon's prior statements were involuntary. More

importantly, the Court finds that Hickman's potential objections to prospective testimony do not present a ripe case or controversy before the Court.

Federal courts only have subject matter jurisdiction over "cases and controversies."[29] Ripeness is a justiciability doctrine "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."[30]  During the suppression hearing, the government indicated that it does not intend to call Harmon as a witness at trial.  Even if the government were to call Harmon as a witness at trial, Hickman has not carried his burden of identifying any specific prospective statement that warrant suppression. Hickman has also failed to provide any authority for his position that a defendant may obtain a pretrial order affirmatively excluding unidentified testimony from a prospective witness.  The Court therefore denies Hickman's request to issue a pretrial order prohibiting Harmon from testifying at trial.

**IT IS ACCORDINGLY ORDERED** this 9th day of October, 2012, that Defendant's Motions to Suppress (Docs. 11 & 12) are hereby **DENIED**.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[29] U.S. Const. art. III, § 2, cl. 1; *Whitmore v. Arkansas*, 495 U.S. 149, 154–55 (1990).

[30] *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003).